**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00002-CV**

_____

**IN THE INTEREST OF H.S.**

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 21-10-13796-CV**

**MEMORANDUM OPINION**

Following a bench trial, K.M. ("Mother") and E.S. ("Father") appeal the trial

court's order terminating their parental rights to their minor child, "Henry," based

on Texas Family Code subsections 161.001(b)(1)(D), (E), (N), (O) and a finding that

termination was in Henry's best interest.[1] *See* Tex. Fam. Code Ann. §

161.001(b)(1)(D), (E), (N), (O), (2). In separate briefs, Mother and Father challenge

the legal and factual sufficiency of the evidence supporting the termination grounds

---

[1]In parental rights termination cases, to protect the identity of the minors, we
refer to the children by a pseudonym or initials and family members by their
relationships to the children. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App.
P. 9.8(b)(2).

1

specified in sections 161.001(b)(1)(D), (E), (N), and (O) and that termination was in Henry's best interest. *See id*. Mother and Father also challenge the trial court's appointment of the Department of Family and Protective Services ("the Department") as permanent managing conservator. Father further argues he received ineffective assistance of counsel. As discussed below, we affirm the trial court's termination order.

## BACKGROUND AND FACTS LEADING TO REMOVAL

In October 2021, the Department filed its Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship naming Henry as the subject of the suit and seeking to terminate Mother's and Father's parental rights. The Department included Investigator James Dorchak's Affidavit in Support of Removal with the Petition. Dorchak outlined a report they received in April 2021 regarding Mother's neglectful supervision of Henry, alleging that Mother was using "pills, cocaine, or methamphetamine[,]" and that Mother had been in jail for assault. The Department also outlined reports it received in May 2021 and September 2021 regarding Father's neglectful supervision of Henry, including mental health issues, a suicide threat, and intoxication. The September 2021 report alleged Father was suicidal and had threatened to kill himself and Henry, which led to him being taken to the hospital. Mother reportedly picked Father up from the hospital, and they were "allegedly using drugs" with Mother

2

stating that Father "shot up heroin" and had "bars." Father "was trying to harm himself and refused medical care."

The Affidavit described the Department's investigation and difficulties locating Mother and Henry during the investigation, which led to Henry being placed on the Child Safety Check Alert List. Dorchak averred that after setting up a safety plan with Mother in September 2021, the next day, he was notified that Mother left in the middle of the night. Dorchak further averred that he was informed by a Harris County Deputy that they discovered Mother to be incapacitated in the backseat of her car, and Henry was with her. Mother was taken to the hospital, and Henry was taken to the Conroe Child Protective Services' (CPS) office where the Department took emergency custody.

The Affidavit also described Mother's history with the Department beginning in 2008 and involving her other children. Dorchak outlined the parents' criminal histories, which included substance abuse arrests, assault arrests, and domestic violence arrests, among others.

TRIAL EVIDENCE

The record showed that Mother and Father appeared through counsel, but Father did not personally appear for trial, and Mother personally appeared only on the first day.

<u>Testimony of James Dorchak</u>

CPS Investigator Dorchak testified that he was assigned the case in April 2021, when the investigation began. Dorchak explained that initially, it was hard to locate Mother, but he met Father, who was caring for Henry at his home. Dorchak testified that during this first interaction, Father took care of Henry, had a clean home, and had toys for Henry. At that time, there were no immediate concerns for Henry's safety, but the investigation was ongoing.

In June 2021, Dorchak met Mother for the first time at a gas station, after an incident where Father yelled profanities and screamed at law enforcement. Police arrested Father at the gas station, and Henry was in the backseat of Father's vehicle. Dorchak testified the day of that incident, Father yelled all sorts of profanity at him over the phone, law enforcement was "mainly intervening[,]" and he "couldn't even have a clear conversation with the father." Besides the shouting, yelling, and cursing, Father's slurred speech made Dorchak believe he was impaired.

At that time, Dorchak was not in charge of finding a placement for Henry, so Mother took Henry from the gas station. Mother told Dorchak that she lived with her sister in Liberty County, and Dorchak was instructed to follow Mother to her residence, where he viewed the home and observed nothing concerning at that time. Dorchak next contacted Mother in August 2021, and he implemented a safety plan

4

in September 2021 with Mother and her roommate, but they did not follow it, and there was a period when they could not locate Henry or Mother.

Dorchak testified that in October 2021, a Harris County Sheriff's Deputy informed him that Henry needed care. Dorchak explained that he could not find family placement for Henry, so he put Henry in foster placement. Dorchak testified that based on the available information, he could not place Henry with Mother or Father. Dorchak had concerns about Father not being protective and about his mental state. Dorchak testified that Father could not articulate thoughts about the CPS case and "didn't understand what was going on." Father offered placement options, but when the Department checked them out, they were inappropriate. Dorchak explained that the paternal grandmother was not an appropriate placement, because Father and his brother had criminal histories and lived with her.

In October 2021, when Dorchak located Henry, Father described Mother's condition as "messed up" and that she did not know where she was. Dorchak characterized the parents' relationship during the investigation as "off and on." Dorchak also confirmed that during the entire investigation, between April and October 2021, Henry was in the care of one or both parents.

Dorchak testified that both parents had a criminal history. Dorchak testified that documents admitted into evidence showed in February 2019, Mother was convicted of a second driving while intoxicated offense. Additionally, the

5

documentary evidence included information on an aggravated assault charge against Mother that occurred in April 2021 and a conviction for possession of a controlled substance in November 2021. In May 2022, a criminal complaint was filed against Mother for family violence. Dorchak testified that Mother's criminal history concerned him, as the ongoing substance charges and domestic violence charges had not made for a safe environment for a child. Dorchak explained that the charges he discussed all occurred in the last few years.

Dorchak also testified that Father was convicted of possession of a controlled substance in 2016 and had deferred adjudication for a terroristic threat against a public servant in 2019. Father's behavior likewise concerned him. Dorchak testified there were allegations of domestic violence between Mother and Father, and Mother talked to him about the allegations. Dorchak explained that he was concerned about leaving Henry with Mother or Father, given the ongoing issues with substance abuse and domestic violence.

Dorchak testified that during the investigation, given his concerns about both parents using drugs, he asked them to drug test, but they never did. When Dorchak asked them to drug test, Mother told him to get her drug tests through the probation department, which he eventually did "with some difficulty." Dorchak said Father "just refused to go."

## Mother's Testimony

During the first day of trial, Mother testified that she did not recall when Henry was removed from her care, because she was unconscious "due to health reasons" inside of a Walgreens. Mother testified she now knows that she was unconscious due to a thyroid problem and was prescribed the wrong medication. Mother testified that Henry went to Walgreens with her but stayed in the vehicle with her friend, and she denied she neglected him. Mother testified the next thing she recalled was waking up and leaving the hospital to find Henry. Mother said she was in the hospital for a couple of hours.

Mother denied that she was ever asked to drug test, that she was on probation, and that she was taking drug tests for probation. Mother testified that she recalled meeting with another caseworker, Serenity Hubert, who discussed services with her. Mother remembered being asked to complete services, including a parenting class, but she testified that nobody would answer her calls when she tried to arrange them. Mother said a new caseworker asked her to undergo a psychiatric evaluation; she testified she did but did not receive a report or recommendations from the evaluation. Mother explained that she was asked to complete a drug and alcohol assessment but did not, because she missed two appointments, so they refused to work with her anymore, and she did not recall being sent to another place. Mother testified that she

7

has insomnia, PTSD, is bipolar, and takes multiple medications for these conditions. Mother did not return the second day of trial to complete her testimony.

Testimony of Teresa Horton

Teresa Horton testified that she has been the assigned caseworker since January 2022.[2] Horton explained there was a service plan created for Mother at the beginning of the case, but she created a second one for Mother when she was assigned to the case. Horton testified that she reviewed the plan with Mother, which Mother signed. Horton testified that she asked Mother to undergo a drug and alcohol assessment with drug screening, domestic violence with possible battering intervention and prevention program, counseling services, a psychological and a psychiatric evaluation, visitation, and anger management. Horton also asked Mother to continue drug testing. Horton testified that Mother did not complete any services. Horton testified that Mother "never followed through. I could not get her to give me a straight answer half the time."

Horton explained that they arranged weekly visitation for Mother with Henry at the Conroe CPS office, but Mother did not attend all the visits. Horton said they changed the visitations in March, because during a visit they observed Mother "sliding down to the floor. She was swaying back and forth when she was standing

---

[2]For the purpose of disclosing potential conflicts, we note that Justice Horton is not related to Teresa Horton.

up. She was slurring her words. At one point she dropped her phone [be]cause she fell asleep." Horton testified that she did not think this was safe or appropriate, so they stopped the visit and asked both parents to go drug test, but they did not. Father was there during this visit, and "he wasn't under the influence as much as she was, but he was slow, I guess. He was reacting slow." Horton testified that following this incident, because of the parents' lack of progress and not staying in touch, they moved the visits to one hour per month, and the parents only came to two of those monthly visits. Horton explained that the parents failed to show for more than half the visits after confirming, so Henry had to return home without seeing them.

Horton testified that the parents failed to alleviate the safety concerns during the case. Horton explained that the concerns included Mother's drug use and not being safe around Henry, and Mother completed no services designed to prove that she was no longer doing those things. Horton did not see any action from Mother to show that she was not using substances; Horton asked Mother to drug test every time she saw her, but Mother did not take a single drug test. Horton also asked Father to drug test. Horton expressed concerns about Father's drug use and not being safe around Henry. Horton tried repeatedly to visit the parents' homes but could not get a response. Horton explained that she has never seen the home of either parent, and she has been unable to ensure their homes were safe and appropriate. Horton was also concerned about domestic violence, which the parents failed to alleviate. Horton

9

testified that her concerns for returning Henry to Mother included Mother's failure to get help for substance abuse and domestic violence, and Horton did not believe Mother would be safe for Henry. With respect to returning Henry to Father, Horton was also concerned about substance abuse and domestic violence and did not think it would be safe for Henry.

Horton testified that Father reported he was working but could not provide the employer's name, and neither parent provided employment verification. Horton testified Father and Mother "got back together" in January or February and were living together. Father did not do his parenting classes. Horton explained that Father wanted Henry placed with his mother, but she did not pass the home study. Father went to Tri-County for mental health services and obtained medication, but Horton did not know if he continued to follow through. Horton was not concerned about Father being under the influence the last time she saw him, because he was released from jail that morning.

Horton said the Department's goal is termination of the parents' rights and unrelated adoption. She testified that Henry is two and currently in a "foster only" placement. Horton testified it was in Henry's best interest that the parents' rights be terminated and that he remain in the permanent managing conservatorship of the Department until they identified a home. Horton explained that they were moving Henry to a foster-to-adopt placement, and he began visits with that family. Horton

10

testified that Henry would remain in a foster home if not adopted, but the family they are looking into wants to adopt. Horton described the visitation process for Henry with the potential adoptive family and testified their first visit with him "went really well." Horton testified that the Department is asking for termination of both parents' rights, and she believed termination was in Henry's best interest.

Testimony of Randolph Hansen

Randolph Hansen testified that he is the CASA advocate and has been since October 2021. Hansen said he visits Henry at least once a month, and Henry does not have any observable special needs at this time. Although Hansen testified he was not concerned with the parents' supervised visits with Henry, he would be concerned if either parent visited the child unsupervised. Hansen testified that the first visit between Henry and the potential adoptive family went well. He recommended the transition to the adoptive family continue, but he was not concerned about Henry's current placement. Hansen testified he also recommended termination of both parents' parental rights and agreed with the Department's goal for Henry. Hansen explained that he based this on the fact that the parents are "not good parents" and are "very erratic[;]" they have no financial stability and have an unwillingness or inability to complete their services, and they have shown a lack of effort to visit Henry and attend court proceedings. Hansen agreed with the Department having

11

permanent managing conservatorship of Henry for the purposes of adoption and believed it was in Henry's best interest.

Other Evidence

Documentary evidence admitted at trial included, among other things, the court's orders incorporating the service plans, the service plans for both parents, Mother's criminal history, and Father's criminal history. For Mother, the criminal history evidence included a recent judgment for family violence assault causing bodily injury, driving while intoxicated, and possession of a controlled substance. The criminal history evidence for Father included a recent judgment for evading arrest, assault on a public servant, making a terroristic threat against a public servant, and possession of a controlled substance.

STANDARD OF REVIEW

The standard of proof required in cases involving termination of parental rights is clear and convincing evidence, which is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. §§ 101.007, 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012) (citing *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)) (other citations omitted). Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interests. *See In re A.V.*, 113 S.W.3d

12

355, 362 (Tex. 2003) (applying previous version of the statute). Yet when, as here, a parent challenges the endangerment findings under section 161.001(b)(1)(D) or (E), due process concerns and the requirement for a meaningful appeal dictate that we review these grounds. *See In re N.G.*, 577 S.W.3d 230, 236–37 (Tex. 2019) (per curiam); *In re C.M.C.*, 554 S.W.3d 164, 171 (Tex. App.—Beaumont 2018, no pet.).

When conducting a legal sufficiency review of the termination of parental rights, we examine all the evidence in the light most favorable to the finding to determine whether "a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266; *see also In re J.O.A.*, 283 S.W.3d 336, 344–45 (Tex. 2009). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could, and we disregard all evidence a reasonable factfinder could have disbelieved or found incredible. *In re J.O.A.*, 283 S.W.3d at 344–45; *In re J.F.C.*, 96 S.W.3d at 266; *see also In re E.N.C.*, 384 S.W.3d at 802. The evidence is legally insufficient if no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true. *In re J.F.C.*, 96 S.W.3d at 266.

In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing" and must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In*

13

*re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). Considering the entire record, if the disputed evidence a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.* We defer to the factfinder and do not substitute our judgment for the factfinder's. *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole arbiter of the witnesses' credibility and demeanor. *See id.* at 109 (quoting *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)).

## ANALYSIS

### Ineffective Assistance of Counsel

In his first issue, Father complains that he was deprived of the ability to participate in the final trial. Father asserts that counsel announced to the court on both days of trial that Father could not be there due to transportation issues, yet counsel failed to file a written motion for continuance both times.

Claims that trial counsel provided ineffective assistance in cases involving termination of parental rights are governed by the two-prong test stated in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *In re D.T.*, 625 S.W.3d 62, 73 (Tex. 2021); *In re M.S.*, 115 S.W.3d 534, 544–45 (Tex. 2003). Under the *Strickland* test, the complaining party must show: (1) counsel's performance was deficient, which means counsel made errors so egregious that they were not functioning as

14

"'counsel'" guaranteed by the Sixth Amendment; and (2) counsel's deficient performance prejudiced the complaining party such that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceedings would have been different. *In re M.S.*, 115 S.W.3d at 545 (quoting *Strickland*, 466 U.S. at 687); *see also In re D.T.*, 625 S.W.3d at 73.

When evaluating trial counsel's performance, we indulge a strong presumption that counsel's conduct is within the wide range of reasonable, professional assistance, which includes trial strategy. *See In re M.S.*, 115 S.W.3d at 545 (quoting *Strickland*, 466 U.S. at 689) (other citations omitted). An appellant has the burden to overcome the presumption that, under the circumstances, the challenged conduct might be considered sound trial strategy. *Strickland,* 466 U.S. at 689. If the record is silent about the reasons for counsel's actions, we do not speculate to find ineffective assistance of counsel. *In re A.S.*, No. 09-21-00142-CV, 2021 WL 5113817, at *11 (Tex. App.—Beaumont Nov. 4, 2021, pet. denied) (mem. op.); *see also Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 623 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citation omitted). "Any claim of ineffective assistance must be firmly founded in the record and the record must affirmatively demonstrate the ineffectiveness." *In re S.M.T.*, 241 S.W.3d 650, 653 (Tex. App.—Beaumont 2007, no pet.) (citation omitted).

In this case, Father has not met either prong of the *Strickland* test. *See Strickland*, 466 U.S. at 687; *In re D.T.*, 625 S.W.3d at 73; *In re M.S.*, 115 S.W.3d at 545. The record reveals that on the first day of trial counsel told the trial court Father could not attend because he was at work. Counsel announced not ready and orally moved for a continuance; the trial court asked if counsel filed a motion, to which counsel responded she had not and had only learned the information ten minutes earlier. The record also shows that the trial court did not deny the motion for continuance because it was not in writing. Rather, the trial court explained that the case was continued from the first trial setting, "and we have a quickly approaching dismissal deadline and not a lot of time between now and that dismissal deadline." On the second day of trial, Father's counsel also requested a continuance and revealed the parents were together but having transportation issues. The trial court denied the requested continuance and again noted the dismissal deadline, "So based on the timeline and the dismissal deadline in this case, I'm going to deny the request to recess again; and we are going forward today."

The record establishes that counsel only learned of Father's unavailability the first day of trial minutes before, and the second day Father could not appear due to transportation issues. Given such circumstances, we cannot say that counsel's failure to file a written motion for continuance constituted deficient performance under the first prong of *Strickland*. *See Strickland*, 466 U.S. at 687; *In re D.T.*, 625 S.W.3d at

16

73; *In re M.S.*, 115 S.W.3d at 544. The trial court did not deny the continuances because they were not in writing. Instead, the trial court denied the continuances based on the dismissal date. *See In re R.A.D.G.*, No. 10-14-00085-CV, 2014 WL 4960792, at *2 (Tex. App.—Waco Oct. 2, 2014, no pet.) (mem. op.) (explaining that father failed to meet his burden of establishing his trial counsel's failure to file a written, verified motion for continuance constituted defective performance where the trial court did not deny the motion because it was not written). Father cannot show that but for counsel's failure to file written motions for continuance, the result of the proceedings would have been different and therefore, failed also to satisfy the second prong of *Strickland*. *See Strickland*, 466 U.S. at 687; *In re D.T.*, 625 S.W.3d at 73; *In re M.S.*, 115 S.W.3d at 544; *see also In re R.A.D.G.*, 2014 WL 4960792, at *2. We overrule Father's first issue.

Predicate Grounds

Mother and Father challenge the sufficiency of the evidence supporting the trial court's endangerment findings, so we first consider whether the evidence is sufficient to support the findings terminating Mother's and Father's rights under subsections 161.001(b)(1)(D) and (E). *See In re N.G.*, 577 S.W.3d at 235–36. If the evidence is sufficient as to one of these grounds plus sufficient evidence exists to support the best interest finding, we will affirm the termination order. *See id.* at 232–33. Since evidence of grounds D and E is often interrelated, we consolidate our

17

review of these grounds. *See In re J.L.V.*, No. 09-19-00316-CV, 2020 WL 1161098, at \*10 (Tex. App.—Beaumont Mar. 11, 2020, pet. denied) (mem. op.).

Subsection D allows for the termination of parental rights if clear and convincing evidence supports that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(D). Under subsection E, parental rights may be terminated if clear and convincing evidence establishes the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" *Id.* § 161.001(b)(1)(E). The Texas Supreme Court has explained that "'endanger' means to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (citation omitted). To endanger a child, "it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* (citation omitted).

"Subsection D requires the endangerment to the child to be the direct result of the child's environment." *See Interest of J.H.*, No. 09-20-00056-CV, 2020 WL 4516860, at \*10 (Tex. App.—Beaumont Aug. 6, 2020, no. pet.) (mem. op.) (citation omitted). "Endangerment under subsection (D) arises from a child's environment and a parent's disregard for the potential for danger created by the environment." *In re I.V.H.*, No. 01-19-00281-CV, 2019 WL 4677363, at \*5 (Tex. App.—Houston [1st

18

Dist.] Sept. 26, 2019, pet. denied) (mem. op.) (citation omitted). We consider the child's environment before the Department obtained custody in our subsection D endangerment analysis. *See In re J.L.V.*, 2020 WL 1161098, at *10. Under subsection D, termination may be based on a parent's single act or omission. *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied). It is unnecessary that a parent know with certainty the child is in an endangering environment; instead, awareness of the potential for danger and disregarding the risk is enough to show endangering conduct. *See In re J.H.*, 2020 WL 4516860, at *10. To terminate a parent's rights under subsection E, the evidence must "show a conscious course of conduct." *In re C.M.C.*, 554 S.W.3d at 172 (citing *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)). In our analysis of subsection E, we may consider actions occurring before and after a child's birth to establish a "course of conduct." *See id.* (citation omitted).

Evidence of a parent's drug use can establish that the child's surroundings endanger his physical or emotional well-being under subsection D and qualify as a "voluntary, deliberate, and conscious course of conduct endangering the child's well-being under subsection (E)." *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) (citation omitted). A parent's continued drug use after the child's removal is conduct that risks parental rights and may support an endangering course of conduct under E. *See Cervantes-Peterson v. Tex. Dep't of Family &*

19

*Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (noting that mother's continued narcotics use after child's removal in the face of drug testing, jeopardized her relationship with her child). The trial court may infer from these refusals to drug test that the parents were using drugs. *See In re M.S.*, No. 09-22-00313-CV, 2023 WL 1453166, at *6 (Tex. App.—Beaumont Feb. 2, 2023, no pet.); *In re K.C.B.*, 280 S.W.3d 888, 895 (Tex. App.—Amarillo 2009, pet. denied) (noting trial court may infer from parent's refusal to submit to drug test that they are using drugs).

"'Domestic violence and a propensity for violence may be considered evidence of endangerment, even if the endangering acts did not occur in the child's presence, were not directed at the child, or did not cause actual injury to the child.'" *In re M.S.*, 2023 WL 1453166, at *6 (quoting *In re K.A.R.*, No. 04–17–00723–CV, 2018 WL 1733147, at *3 (Tex. App.—San Antonio Apr. 11, 2018, pet. denied) (mem. op.)); *see also Boyd*, 727 S.W.2d at 533. A parent's abusive or violent conduct or that of other residents of a child's home can create an environment endangering to the child's physical or emotional well-being. *In re M.S.*, 2023 WL 1453466, at *6; *In re K.A.S.*, 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied).

As to Mother, the trial court heard testimony that she arrived impaired for a visit with Henry, refused to submit to drug testing during the case's pendency, and failed to complete her services. *See Cervantes-Peterson*, 221 S.W.3d at 253.

20

Testimony and documentary evidence admitted at trial also established that Mother had two convictions for driving under the influence and another conviction for possession of a controlled substance. Although Mother denied that she was asked to undergo drug tests, the trial court was free to disbelieve this testimony and believe the caseworkers' testimony. *In re H.R.M.*, 209 S.W.3d at 109. Dorchak testified there were concerns for domestic violence, and documentary evidence showed that Mother was convicted of a family violence assault causing bodily injury to Father. *See In re M.S.*, 2023 WL 1453466, at *6; *In re K.A.S.*, 131 S.W.3d at 222.

Viewing the evidence in the light most favorable to the trial court's findings, we conclude that the trial court could reasonably have formed a firm belief or conviction that Mother knowingly placed or knowingly allowed Henry to remain in conditions or surroundings which endangered his physical or emotional well-being and engaged in conduct or knowingly placed Henry with persons who engaged in conduct that endangered Henry's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *In re J.O.A.*, 283 S.W.3d at 345; *In re J.F.C.*, 96 S.W.3d at 266; *Boyd*, 727 S.W.2d at 533; *In re M.S.*, 2023 WL 1453466, at *6–7.

Regarding Father, evidence established that despite the domestic violence concerns between the parents, they were still together "off and on." *See In re M.S.*, 2023 WL 1453466, at *6; *In re K.A.S.*, 131 S.W.3d at 222. The trial court also heard

21

testimony describing Father's outburst in a gas station parking lot while Henry was with him that ultimately led to Father's arrest. The documentary evidence revealed convictions for Father for assaulting a public servant and making a terroristic threat against a public servant. The CPS investigator testified about Father's refusal to submit to drug testing while the case was pending. *See In re M.S.*, 2023 WL 1453166, at *6; *In re K.C.B.*, 280 S.W.3d at 895. Dorchak also expressed concern about Father's lack of protective abilities and his mental state.

Viewing the evidence in the light most favorable to the trial court's findings, we conclude that the trial court could reasonably have formed a firm belief or conviction that Father knowingly placed or knowingly allowed Henry to remain in conditions or surroundings which endangered his physical or emotional well-being and engaged in conduct or knowingly placed Henry with persons who engaged in conduct that endangered Henry's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *In re J.O.A.*, 283 S.W.3d at 345; *In re J.F.C.*, 96 S.W.3d at 266; *Boyd*, 727 S.W.2d at 533; *In re M.S.*, 2023 WL 1453466, at *6–7.

We determine that the Department established, by clear and convincing evidence, that Mother and Father committed the predicate acts enumerated in subsections 161.001(b)(1)(D) and (E). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *In re M.S.*, 2023 WL 1453466, at *6–7. Having concluded

22

the evidence was legally and factually sufficient to support the trial court's findings on subsections 161.001(b)(1)(D) and (E), we need not address Mother's and Father's challenges to the trial court's findings under (N) and (O). *See In re N.G.*, 577 S.W.3d at 235, *In re M.S.*, 2023 WL 1453466, at \*7; *see also* Tex. R. App. P. 47.1. We overrule Mother's and Father's issues challenging the legal and factual sufficiency of the evidence supporting predicate acts under subsections (D) and (E).

Best Interest

Both parents challenge the legal and factual sufficiency of the evidence supporting the trial court's best interest finding. Trial courts have wide latitude in determining the child's best interest. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). There is a strong presumption the child's best interest is served by keeping him with his parent. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (citation omitted); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see also* Tex. Fam. Code Ann. § 153.131(b). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a).

The Family Code outlines factors in determining whether a parent is willing and able to provide a safe environment for the child. *See id.* § 263.307(b). Several other nonexclusive factors may be considered in a best interest analysis, including: (1) the desires of the child; (2) the emotional and physical needs of the child now

23

and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018) (characterizing the *Holley* factors as "non-exclusive"). No particular *Holley* factor is controlling, and evidence of one factor may be enough to support a finding that termination is in the child's best interest. *See M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 311 (Tex. App.—El Paso 2009, pet. denied) ("Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of a child.") (citations omitted); *see also In re C.H.*, 89 S.W.3d at 27.

We may consider circumstantial evidence, subjective factors, and the totality of the evidence in our best interest analysis. *See In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). A parent's past conduct is relevant to determining the parent's present and future ability to care for a child. *See In re C.H.*,

24

89 S.W.3d at 28. Evidence supporting the statutory grounds for termination may also support a best interest finding. *See id.*

We have explained the evidence shows Father's history of drug use, outbursts leading to arrest, and multiple criminal convictions. The trial evidence established Father's lack of protectiveness and continued relationship with Mother despite her assault against him which led to a domestic violence conviction. The evidence further showed that Father did not regularly visit Henry during the proceedings and failed to complete services.

Likewise, the evidence established Mother's multiple criminal convictions, drug use, and history of domestic violence against Father. The record established that Mother refused to follow a safety plan the Department implemented, and the Department could not locate Mother or Henry for a period despite the existence of a safety plan. A caseworker also testified that Mother completed none of the services to help deal with her substance abuse and other issues. Finally, a caseworker established that Mother did not regularly visit Henry and even showed up to one visit impaired, which led them to stop in-person visits.

Although evidence of placement plans and adoption are relevant to best interest, a lack of evidence about definitive plans for permanent placement and adoption are not dispositive. *See id.* Rather, based on the entire record, we ask if a factfinder could reasonably form a firm conviction or belief that termination of the

25

parent's rights is in the child's best interest—even if the agency cannot precisely identify the child's future home environment. *See id.* Henry remained in foster care at the time of trial, but evidence showed the Department recently located a potential adoptive family, and the initial meetings between the family and Henry went well. The caseworker and ad litem testified that it was in Henry's best interest for both parents' rights to be terminated.

Considering the evidence related to best interest, deferring to the trial court's determinations on witness credibility, the resolution of conflicts in the evidence, and the weight given to the testimony, we conclude that the statutory and *Holley* factors weigh in favor of the trial court's finding that termination is in Henry's best interest. *See* Tex. Fam. Code Ann. §§ 161.001(b)(2), 263.307(a), (b); *Holley*, 544 S.W.2d at 371–72. The trial court could have reasonably formed a firm belief or conviction that termination of Mother's and Father's parental rights was in Henry's best interest. *See In re C.H.*, 89 S.W.3d at 28. We overrule Mother's and Father's issue challenging the sufficiency of the evidence to support the best interest finding.

Conservatorship

Father and Mother also challenge the legal and factual sufficiency of the evidence to support the Department's appointment as managing conservator, and Father cites Texas Family Code section 161.207. Both parents argue that the trial

26

court appointed the Department as the managing conservator only as "a consequence to the termination."

The trial court's termination order notes that it appointed the Department as permanent managing conservator and found "that the appointment of the Respondents as permanent managing conservator of the child is not in the child's best interest because the appointment would significantly impair the child's physical health or emotional development." These findings track those required by Family Code section 153.131, which indicates the trial court appointed the Department as the managing conservator under Chapter 153. *See* Tex. Fam. Code Ann. § 153.131; *In re L.M.*, No. 09-22-00307-CV, 2023 WL 2418912, at *5 (Tex. App.—Beaumont Mar. 9, 2023, no pet.) (mem. op.) (determining same). When a trial court appoints the Department as the child's managing conservator based on its authority under Chapter 153, the parent must challenge the trial court's appointment of the Department as the child's managing conservator to preserve a challenge. *See In re J.A.J.*, 243 S.W.3d 611, 615–17 (Tex. 2007) (explaining that parent must raise an issue on appeal challenging trial court's appointment of the Department when the findings show it was appointed under Family Code section 153.131 as a challenge based on those findings is not subsumed by a parent's claim that terminating the parent-child relationship is not in the child's best interest); *In re L.M.*, 2023 WL 2418912, at *4 n.22. Mother and Father did not specifically challenge the

conservatorship findings under 153.131, instead they seemingly challenged the findings based on Family Code section 161.207. *See In re L.M.*, 2023 WL 2418912, at *5 (upholding Department's appointment as conservator despite reversing termination order where parents failed to challenge the conservatorship findings).

Section 161.207 of the Texas Family Code provides that if the trial court terminates the parent-child relationship with respect to both parents, the Court shall appoint a suitable, competent adult, the Department, or a licensed child-placing agency as managing conservator of the child. Tex. Fam. Code Ann. § 161.207(a). Here, the trial court terminated the parental rights of both parents. Having affirmed the trial court's judgment terminating Mother's and Father's parental rights, their challenge to the conservatorship appointment pursuant to 161.207 was subsumed in the issues related to the termination of his parental rights. *See In re D.N.C.*, 252 S.W.3d 317, 318–19 (Tex. 2008); *In re T.J.*, No. 09-22-00224-CV, 2022 WL 17491817, at *5 (Tex. App.—Beaumont Dec. 8, 2022, pet. denied) (mem. op.). Furthermore, to the extent they challenge the Department's appointment as conservator under Chapter 153, the evidence as outlined in our analysis of their other issues supports the trial court's finding that appointment of the parents as permanent managing conservators "is not in the child's best interest because the appointment would significantly impair the child's physical health or emotional development." *See* Tex. Fam. Code Ann. § 153.131(a). We overrule this issue.

CONCLUSION

Having overruled Mother's and Father's issues, we affirm the trial court's termination order.

AFFIRMED.

_____
W. SCOTT GOLEMON
Chief Justice

Submitted on April 24, 2023
Opinion Delivered June 15, 2023

Before Golemon, C.J., Horton and Johnson, JJ.